**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

TRACY A. CROSS,                              *        CIVIL NO. 4:16-cv-00319-RGE-SBJ
                                             *
              Plaintiff,                     *
                                             *
       v.                                    *
                                             *              **REPORT AND**
NANCY A. BERRYHILL,                          *          **RECOMMENDATION**
Acting Commissioner of Social Security,      *
                                             *
              Defendant.                     *
_____             *   _____

**TABLE OF CONTENTS**

I. INTRODUCTION …………………………………………………………………...2

II. PROCEDURAL HISTORY ……………………………………………….................3

III. REVIEW OF ADMINSTRATIVE RECORD ………………………………………...5

    A.  Records of Medical Treatments and Evaluations ………………………………5
        1.  Prior to October 2010 ………………………………………………........5
        2.  October 2010 through September 2011 ………………………………........7
        3.  After September 2011 …………………………………………………...8

    B.  Records of Agency Proceedings ………………………………………………18
        1.  Testimony of Tracy A. Cross ………………………………………….18
        2.  Testimony of Vocational Expert …………………………………….....21
        3.  Decision of Administrative Law Judge …………………………………22

IV. JUDICIAL REVIEW OF DECISION …………………………………………………25

    A.  Standard of Review ……………………………………………………………25

    B.  Analysis of Cross' Arguments ………………………………………………27
        1.  Determination of Residual Functional Capacity……………………….28
        2.  Existence of Substantial Medical Evidence ………………………….39
        3.  Assessment of Cross' Subjective Complaints ……………………….42
        4.  Adequacy of Hypothetical Question to Vocational Expert ……………44

V. RECOMMENDATION ………………………………………………………………45

# I. INTRODUCTION

Plaintiff Tracy A. Cross ("Cross") seeks judicial review of the Social Security Commissioner's decision denying his Application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *set seq*.   An individual is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 416(i); 42 U.S.C. § 423(d)(1)(A).   Cross was found to suffer from the severe impairments of chronic obstructive pulmonary disorder, status post fusion of the cervical spine and valvular heart disease. But the Commissioner determined that through the date Cross last met the insured status requirements for disability insurance benefits, he was capable of performing past relevant work as a parking cashier supervisor.   Further, even if he were unable to perform past relevant work, considering his age, education, work experience and residual functional capacity, the Commissioner determined there are jobs that exist in significant numbers in the national economy that Cross could perform.   Consequently, the Commissioner concluded Cross was not disabled for purposes of the Act.

Cross insists he is unable to engage in any substantial gainful activity due to his medical impairments and, therefore, is disabled under the Act, and entitled to benefits accordingly.    Cross asserts two primary arguments before this Court: (1) the determination of the residual functional capacity was erroneous because it failed to properly evaluate work-related limitations set forth by an examining physician, and (2) the Commissioner's decision is not supported by substantial medical evidence.   Cross urges this Court to reverse the decision of the Commissioner, and remand his claim for calculation of benefits; alternatively, he requests remand of the matter for further proceedings.

The case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for submission of a report and recommendation regarding disposition. Dkt. 5.   As set forth below, it is recommended that the decision of the Commissioner be affirmed.

## II. PROCEDURAL HISTORY

Cross has filed applications for benefits prior to the application at issue under this judicial review.   On April 17, 2006, Cross filed an Application for Disability Insurance Benefits and an Application for Supplemental Security Income alleging disability beginning April 15, 2005. Administrative Record ("A.R.") 122.   An Administrative Law Judge ("ALJ") issued a written decision denying Cross' application for benefits on December 1, 2008, and review was denied by the Appeals Council. *Id.*   Cross filed another Application for Disability Insurance Benefits on April 15, 2009, again alleging disability beginning April 15, 2005. *Id.*   An ALJ issued a written decision denying the application for benefits on October 15, 2010, and review was denied by the Appeals Council on April 7, 2012. *Id.* 122-32, 137-39.

Cross then sought judicial review of the decision before this Court and, on September 3, 2013, Senior Judge Ronald E. Longstaff affirmed the ALJ's decision that Cross was not disabled from the date after the last denial, December 2, 2008, through the date of the ALJ's decision, October 15, 2010. *See* Order (Dkt. 10) Civil No. 4:12-cv-00245-REL-CFB.   As part of the review, Cross argued the Court should consider as new evidence functional capacity evaluations performed in June 2012 by physical therapist Mark Blankespoor and Dr. Sunil Bansal. *Id.* p. 6.   Judge Longstaff found such evidence did not necessarily reflect Cross' condition at the time the ALJ rendered her decision and, therefore, was not material to the application at issue. *Id.*   Judge Longstaff noted "[i]t may, however, be used to support a subsequent application." *Id.*

During the pendency of that review, on June 4, 2012, Cross applied for Social Security Disability Insurance Benefits with an alleged disability onset date of January 1, 2008. A.R. 222-

28.[1]   The application was denied initially on August 24, 2012, and upon reconsideration on

October 22, 2012. *Id.* 143-60.   Upon a timely request for hearing, Cross' claims were heard before

ALJ Tela L. Gatewood on November 13, 2013. *Id.* 549-82.   Cross was represented by counsel

and testified on his own behalf. *Id.* 554-75.   Vocational expert Elizabeth Albrecht responded to

hypotheticals presented by the ALJ and Cross' counsel. *Id.* 575-80.

ALJ Gatewood issued a written decision denying Cross' application for benefits on January

30, 2015. *Id.* 11-24.   As part of the analysis, the ALJ considered the reports of both P.T.

Blankespoor, which was given "some weight", and Dr. Bansal, which was given "little weight".

*Id.* 20-21.   Cross timely requested a review of the ALJ's decision, and the Appeals Council denied

review on April 19, 2016. *Id.* 1-7.   Consequently, the decision of ALJ Gatewood stands as the

final decision of the Commissioner. *Id.*

Cross filed a Complaint (Dkt. 1) before this Court on June 20, 2016.   He asserts the

January 30, 2015 decision is in error because the ALJ failed to give good reasons for discounting

Dr. Bansal's opinions as to Cross' disabling limitations and for discounting Cross' own testimony

as to his limitations. *Id.* ¶¶ 9-14.   Cross further asserts the ALJ improperly substituted her opinion

for that of the treating/examining source, the decision is not supported by substantial medical

evidence, the ALJ improperly rejected Cross' subjective allegations, and the ALJ posed a

hypothetical question to the vocational expert that does not adequately describe Cross' limitations.

*Id.* ¶¶ 17-20.   Cross asks the Court to reverse the decision of the Commissioner or, alternatively,

vacate the decision and remand this matter for further proceedings. *Id.* p. 3.

The Commissioner filed an answer (Dkt. 2) on September 12, 2016, with a copy of the

Administrative Record (Dkt. 3).   The Commissioner contends Cross has not shown "good cause"

---

[1] Although Cross' Application Summary for Disability Insurance Benefits refers to an application
date of June 4, 2012, the Disability Determination Explanation indicates the Application for
Disability Insurance Benefits was filed June 1, 2012. (A.R. 144, 222).

to warrant reversal or remand under the Act, 42 U.S.C. § 405(g).

Cross filed a brief (Dkt. 10) on December 1, 2016. The Commissioner submitted a responsive brief (Dkt. 11) on January 30, 2017. Cross filed a reply brief (Dkt. 12) on February 13, 2017. Hearing was held before the undersigned on June 1, 2017. This matter is considered to be fully submitted for purposes of this report and recommendation.

### III. REVIEW OF ADMINSTRATIVE RECORD

This Magistrate Judge has reviewed the entire Administrative Record, but summarizes only certain portions as background for the specific issues presented by the parties. First, the medical records will be addressed chronologically and categorized within the periods before, during and after the dates framing this judicial review: October 15, 2010, the date of the last decision, and September 30, 2011, the date Cross' insured status expired. Second, the agency records containing the hearing testimony and decision by the Administrative Law Judge will be reviewed.

**A.  Records of Medical Treatments and Evaluations**

**1.  Prior to October 2010**

On April 1, 2010, Cross was seen for a Compensation and Pension Examination as part of the process of seeking benefits from the U.S. Department of Veterans Affairs for his cervical spondylosis. A.R. 362. He reported progressive neck pain and stiffness that was getting progressively worse. *Id.* Upon physical examination it was noted Cross' posture was normal, his head position was normal, and his gait was normal. *Id.* 364. It was noted Cross had pain with motion. *Id.* 365. It was further noted there was objective evidence of pain following repetitive motion, and limitations after three repetitions of range of motion due to pain. *Id.* 366. It was also noted the condition has progressed since Cross' last pension examination, with the intensity and frequency of pain increasing, the range of motion of the cervical spine decreasing, and a radiation of pain to the bilateral upper extremities, as well as constant daily headaches. *Id.* 369. The report

indicated moderate to severe functional impairment due to this condition, with effects on daily activities with chores-moderate, shopping-mild, exercise-moderate, sports-severe, recreation-mild, traveling-mild, feeding-none, bathing-none, dressing-none, toileting-none, grooming-none. *Id.* 368-69.

On May 4, 2010, Cross underwent another Compensation and Pension Examination relating to his peripheral nerves with Dr. Igor Mitreski. *Id.* 352.   He reported tingling and numbness prior to his neck surgery in 2006, with the symptoms gradually becoming worse. *Id.* 353.   It was noted Cross had been diagnosed and treated for bilateral upper extremity radiculopathy which has become worse in terms of the intensity of numbness and tingling as well as muscle weakness. *Id.* 356.   The etiology was likely to be cervical spondylosis, with moderate functional impairment to Cross. *Id.*   It was noted there are effects on usual daily activities including chores-mild, shopping-none, exercise-moderate, sports-moderate, recreation-mild, traveling-mild, feeding-none, bathing-mild, dressing-mild, toileting-none, and grooming-none. *Id.* 355-56.

On May 5, 2010, Cross was seen for a Compensation and Pension Examination relating to mental disorders by Dr. Michael Gaffney. *Id.* 349.   Dr. Gaffney noted Cross was seen previously for a mental health Compensation and Pension Examination on February 18, 2009. *Id.* 350.   At that time Cross' diagnoses were mood disorder secondary to general medical condition, and alcohol dependence in sustained remission. *Id.*   Medical records show Cross was followed for psychiatric care at the V.A. Central Iowa Health Care System. *Id.*   At his last appointment for psychiatric care on March 10, 2010, Dr. Gaffney noted Cross' mood was seen as improved, and he had a diagnosis of major depressive disorder, recurrent, and was prescribed Citalopram. *Id.* Psychiatric notes from April 6, 2010 noted depressed mood by Cross. *Id.*   Cross indicated that, despite indications of improvement in his medical records, he believed his depressive symptoms

had been getting worse, as he had apathy and low energy. *Id.*  Dr. Gaffney found he could not find Cross is unable to manage in his own interest any benefits for which he is eligible. *Id.* 351. The symptoms reported were consistent with those indicated at the time of the last examination but seem somewhat contradicted by recent treatment records. *Id.*  According to Dr. Gaffney, Cross' mood disorder is related to his chronic health conditions. *Id.* 352.  Considering his mood disorder, Dr. Gaffney found this would result in an occasional inability to perform occupational tasks, and frequent inefficiency in social functioning, with some impairment to self-care, but within a generally adequate baseline level of functioning. *Id.*

### 2.  October 2010 through September 2011

On March 10, 2011, Cross was admitted to the hospital with a discharge date of March 14, 2011. *Id.* 340.  He had been seen in the emergency room earlier with complaints of shortness of breath, myalgias, cough and malaise. *Id.*  He was given prescriptions for Prednisone and Moxifloxacin and discharged. *Id.* 340-41.  That evening he experienced a coughing spell in which he was unable to catch his breath. *Id.* 341.  An ambulance was called, and Cross was brought to the emergency room. *Id.*  Doctors noted the anxiety and coughing spells improved with treatment. *Id.*  Prior to discharge, it was noted Cross was tolerating antibiotics and steroids well, and his anxiety was controlled. *Id.*  Cross was discharged with instructions to follow through with his medications and visit his primary care physician in 7 to 10 days. *Id.* 341-42.

Cross was admitted to the hospital again on March 16, 2011, and discharged March 27, 2011, for treatment of hospital-acquired pneumonia. *Id.* 337.  Cross reported he was taking his medications as directed, but developed a fever, cough and shortness of breath. *Id.* 338.  Upon examination in the emergency room, he showed an abnormal ABG and bilateral lower lobe infiltrates on his chest x-ray. *Id.*  Cross was admitted for further evaluation, and transferred to the ICU where he was managed for hospital-acquired pneumonia, acute respiratory distress syndrome,

and COPD exacerbation. *Id.*   Initially he was kept on high flow oxygen, which was lowered. *Id.* Cross was switched from an IV treatment to steroid treatments upon his breathing subjectively and objectively improving. *Id.*   Cross ultimately felt better, and was discharged with directions for medications and follow-up. *Id.* 339.

On March 26, 2011, Cross had a chest x-ray, which showed the heart was stable, and the lungs remain abnormal. *Id.* 453-54.   The report notes multiple bilateral patchy infiltrates are still present in his lungs. *Id.* 454.   The impression was persistent but improved bibasilar infiltrates. *Id.*

On May 2, 2011, Cross was seen for a Compensation and Pension Examination for miscellaneous neurological disorders by Dr. David Berg. *Id.* 342.   Cross reported headaches following cervical fusion surgery in 2006. *Id.* 343.   Since the surgery, his headaches were more frequent and worse, lasting from six to ten hours, and waking him up at night. *Id.*   Dr. Berg concluded Cross' previous surgery cannot account for his symptoms and headaches. *Id.* 348. Further, despite Cross' complaints of headaches since his cervical fusion in 2006, there were no complaints of headaches noted in medical records until April 27, 2010. *Id.*   A neurological evaluation in October 2009 did not indicate headaches; an examination in February 2009 did not reveal headaches, and during two admissions for COPD and pneumonia in March 2011, during his hospital admissions, there were no complaints of or treatment for headaches. *Id.*   Dr. Berg concluded these headaches should be considered to be tension type headaches. *Id.* 349.

On September 16, 2011, Cross saw Dr. Thomas Hansen for an occipital nerve stimulator trial placement. *Id.* 448.   Dr. Hansen noted Cross has a history of occipital headaches. *Id.*   A test procedure was performed with the stimulation covering predominantly the right side, showing excellent coverage on the right side. *Id.* 448-49.

### 3.  After September 2011

On October 12, 2011, Cross had a CT of his chest performed as a follow-up to a pulmonary

examination. *Id.* 452-53.   The report indicates a previous chest CT demonstrated bilateral pulmonary consolidations. *Id.*   The exam compared with the previous exam from March 2011 notes that the heart size is stable and the previously demonstrated extensive infiltrates had resolved. *Id.* 453.   The impression was marked improvement in the appearance of the chest CT since March 2011, and a stable right lower lobe granuloma. *Id.*

On December 12, 2011, Cross had chest x-rays in connection with a procedure to implant a nerve stimulation electrode. *Id.* 452.   Comparing this x-ray with one from March 2011, and a CT from October 2011, the report notes the heart and mediastinum are normal, the lungs are hyper inflated, and the granuloma on the right lung base. *Id.*   Impressions include the right lower lobe granuloma is unchanged from 2008. *Id.*

On December 21, 2011, Cross had a procedure to implant a nerve stimulation electrode to address occipital neuralgia. *Id.* 446-47.   Dr. Kenneth Follett performed the procedure and noted Cross did not have much relief of his symptoms with conservative measures, but did very well during a trial with a nerve stimulation system. *Id.* 447.   Dr. Follett reported Cross tolerated the procedure without difficulty, and a test stimulation was performed showing excellent coverage of the occipital regions, completely covering Cross' areas of pain. *Id.*

On December 22, 2011, Cross had chest x-rays. *Id.* 450.   The report notes the location of the nerve stimulator unit battery that Cross had previously received, and that the heart and mediastinum are normal. *Id.*   The lungs remain hyperinflated and a stable granuloma is present in the right lung base. *Id.*

On April 18, 2012, Cross reported to the emergency room with coughing and wheezing. *Id.* 445.   He indicated he had started smoking again, and has COPD. *Id.*   Cross was given a nebulizer and steroids, which noted a subjective and objective improvement. *Id.* 446.   Dr. John Koester, the emergency room physician, noted Cross is not committed to stop smoking. *Id.*   Cross

had chest x-rays performed due to his appearance at the emergency department. *Id.* 449.   The report notes the heart size is within normal limits, and there is no congestive failure. *Id.*   Lung fields are hyperaerated, and there is a nodule in the periphery of the right lower lobe. *Id.* 449-50. The report notes further no significant interval change from the previous study done on December 22, 2011. *Id.* 450.   The impression is chronic obstructive pulmonary disease, and healed granuloma in the right lung base. *Id.*

On May 2, 2012, Cross was seen at the Pulmonary Clinic by Dr. Adam Glazier. *Id.* 421. Dr. Glazier noted Cross continues to smoke and has had at least one emergency room visit since he saw him last. *Id.*   Cross reported intermittent chest tightness and congestion. *Id.*   The impression of Dr. Glazier was continued exacerbations to Cross' COPD and tobacco use disorder. *Id.* 422.   Dr. Glazier reviewed with Cross the importance of smoking cessation, and Cross indicated he understood this. *Id.*   Cross was to report and return to the clinic in six months. *Id.*

On May 29, 2012, Cross was seen in the psychiatric clinic for continued psychiatric management and psychotherapy for major depressive disorder recurrence. *Id.* 390.   Psychiatric Nurse Practitioner ("NP") Sally Watson met with Cross who reported his mood was fairly good given the situational stress related to his father's end stage illness. *Id.*   He stated, "all things considered I think psychiatric medications are working real well." *Id.*   The Axis I diagnosis was adjustment disorder with anxiety, chronic stressors and major depressive disorder recurrent with anxiety. *Id.* 394.   The treatment plan included continuing with medications and individual psychotherapy. *Id.*   Cross reported his mood was pretty level, neutral with low energy. *Id.* 390. He also reported intermittent anxiety, denied suicidal ideation and denied psychotic or manic symptoms. *Id.*   It was noted Cross was neatly groomed, cooperative, had good eye contact, was alert and attentive, his mood was neutral and anxiety controlled. *Id.* 393.

On June 12, 2012, Cross was seen in an outpatient clinic, reporting tachycardia due to the

nebulizer he was using, and requested to switch nebulizers. *Id.* 383-84.   He reported he continues to smoke and had a nerve stimulator placed which improved his pain, although he indicated he still needs pain medication. *Id.* 384.   It was noted Cross reported no chest pain, and had not been seen by a cardiologist for two years, but was due to later in June. *Id.* 384-85.

On June 13, 2012, Cross met with Mark Blankespoor, a physical therapist ("PT"), for a functional capacity evaluation. *Id.* 305-06.   The report noted Cross' primary diagnoses include low back pain, left ankle pain, neck pain, right knee pain and COPD. *Id.* 305. PT Blankespoor noted there was consistency among the functional capacity evaluation items within all areas, and that Cross' functional limitations are consistent with the physical findings of the musculoskeletal exam. *Id.*   As a result, PT Blankespoor concluded the results gained should be a valid basis for discussing appropriate work duties. *Id.*

PT Blankespoor noted Cross did not display the capability to safely perform any functions on a frequent to continuous basis, and noted the following significant deficits: lifting, carrying, pushing/pulling, positional tasks, sitting tolerance, standing/walking tolerance, stair/step ladder climbing, bilateral upper extremity grip and pinch strength and bilateral upper extremity coordination. *Id.* 306.   PT Blankespoor concluded that Cross' capabilities place him in the sedentary category, which is lifting up to 15 pounds on a rare basis, and up to 5 pounds on an occasional basis with the front carry task. *Id.*   PT Blankespoor further noted that although Cross' capabilities were in a sedentary category, he would have significant difficulty with performing work tasks on a full-time basis. *Id.*

PT Blankespoor further indicated that, based on his review of Cross' medical records, it is his opinion Cross "was significantly limited in his function previous to October of 2010." *Id.*   In his physical exam of Cross, PT Blankespoor noted Cross displayed a significantly decreased ambulatory endurance, he exhibited a forward flexed standing posture, he displayed a below

average coordination with bilateral upper extremities, and his balance was poor with bilateral lower extremities. *Id.* 309.

Dr. Sunil Bansal responded to questions submitted by Cross' attorney concerning Cross' medical condition in a report with a June 22, 2012 date of service and signed July 18, 2012. *Id.* 312-17.   Dr. Bansal was provided with Cross' medical records and the physical therapist's functional capacity evaluation to review. *Id.* 312.   In response to an inquiry as to Cross' diagnosis, course of treatment, and prognosis, Dr. Bansal first listed the following diagnoses: chronic obstructive pulmonary disease, flattened diaphragms, right lower lobe lung nodule, alcoholism, depression, PTSD, coronary artery disease, dyslipidemia, leukocytosis, impairment of left ventricular systolic function, unstable angina, CVA/TIA's, history of coronary artery disease with stent placement recently, history of chronic back, neck and ankle pain, lateral epicondylitis, spondylosis in the cervical region, status post anterior fusion of C5-C7, spondylosis in the thoracic region, colon polyps and psoriasis. *Id.* 312-13.   Dr. Bansal then indicated Cross needs psychiatric treatment, treatment for chronic neck and back pain, and due to the length of time that has elapsed with continued pain and loss of range of motion in his neck and back he will likely need additional medications and therapy "for the rest of his life to help resolve his strength, mobility and pain issues." *Id.* 313.   Dr. Bansal also indicated that, due to Cross' severe COPD, psychiatric and chronic pain conditions, it is unlikely that his conditions will improve, and his internal medicine conditions will likely worsen with age, as will his orthopedic conditions. *Id.*

Dr. Bansal agreed with the findings of the functional capacity evaluation done by PT Blankespoor, and the limitations on Cross' ability to perform work-related activities on a sustained basis. *Id.* 313-14.   Dr. Bansal further indicated Cross' work-related limitations for the time period from October 16, 2010 to the present date appear to be consistent with his medical condition when he was evaluated for Social Security/Disability. *Id.* 314.   Dr. Bansal noted Cross can lift and carry

5 pounds occasionally and 2 pounds frequently, can sit at one time for 30 minutes and for 3 hours in an 8-hour work day, and can stand for 15 minutes at one time and for 2 hours in an 8-hour work day. *Id.* 315-16.   Due to his chronic neck and back pain, Dr. Bansal opined Cross will need to sit, stand or walk as tolerated with frequent breaks and the ability to change positions frequently. *Id.* 316.   Dr. Bansal noted Cross displayed an unsteady gait in his office, which was also noted in PT Blankespoor's evaluation. *Id.*   Dr. Bansal opined Cross would miss work at least 3 times per month, and would have good days and bad days. *Id.* 317.   Finally, Dr. Bansal opined limitations to Cross' abilities to reach at 15 minutes at one time and 100 minutes in an 8-hour work day, to handle at 15 minutes at one time and 2 hours in an 8-hour work day, and to finger at 30 minutes at one time and 4 hours in an 8-hour work day. *Id.* 317.   Dr. Bansal indicated the earliest date those limitations apply was January 1, 2009, and Cross' "symptoms will increase with repetitive reaching, gripping, pinching, or grasping, thus to keep his symptoms minimized, he should avoid these tasks." *Id.*

On June 27, 2012, Cross saw Dr. Eduardo Antezano for a cardiology consultation. *Id.* 372. Cross denied any chest pain, pressure or tightness, and indicated most of the problems he had was with respect to his breathing. *Id.*   It was noted Cross had nonobstructive coronary artery disease, and it was recommended he be managed with medical therapy and "must quit smoking." *Id.* 374, 377.

On July 11, 2012, Cross saw Rita Schacherer, Licensed Social Worker, for an individual psychotherapy session. *Id.* 548.   Cross presented with moderate depression, and described generally good management of his emotions and behavior over the course of his father's declining health and death, which had occurred within the last two weeks. *Id.*   Ms. Schacherer noted that overall, despite the difficulties of the current events, Cross evidenced decreased depression and irritability, acceptance of the distress in his life and generally positive coping. *Id.*

On August 20, 2012, Dr. Donald Shumate reviewed medical records of Cross for the purposes of an agency disability determination. *Id.* 149-52.   Dr. Shumate found Cross to have a history of coronary artery disease, chronic obstructive pulmonary disorder, and a cervical spine C5-7 fusion. *Id.* 151.   Dr. Shumate reviewed the reports by PT Blankespoor and Dr. Bansal, and noted those results were significantly different compared with the findings of Dr. Berg in 2011. *Id.*   Dr. Shumate found no explanation for the inconsistency between those findings, and determined that the preponderance of the evidence supports an RFC for Cross that includes occasional lifting of 20 pounds, frequent lifting of 10 pounds, standing for six hours in an 8-hour work day, sitting for 6 hours in an 8-hour work day, and unlimited pushing and pulling other than limitations for lifting and carrying. *Id.* 149, 151.   Dr. Shumate further determined that medical records indicate Cross would have had a difficult time with heavy lifting, however, he would have been able to perform lighter lifting and carrying. *Id.* 152.   Dr. Shumate found there was not sufficient evidence to determine any issues with Cross' mental health during the period of time he was eligible for benefits. *Id.*   Dr. Shumate determined Cross was not disabled. *Id.*

On August 29, 2012, Cross saw Psychiatric NP Watson. *Id.* 544.   Cross was scheduled to resume his individual psychotherapy on this same date, and reported the death of his father in July. *Id.*   He also reported erratic sleeping hours, "so so" appetite, and that his mood was down since his father's death. *Id.*   NP Watson noted Cross was neatly groomed, cooperative, with good eye contact, his mood was neutral and anxiety controlled, and his insight and judgment were good. *Id.* 546.   She diagnosed Cross with adjustment disorder with anxiety, chronic stressors and major depressive disorder recurrent with anxiety. *Id.*   The treatment plan was for Cross to continue with his medications and individual psychotherapy and to follow-up in three months. *Id.* 547.

Later the same day, Cross was seen in an individual psychotherapy session by social worker Schacherer for treatment of depression, anxiety and bereavement. *Id.* 543.   He presented with

moderate depression and anxiety, with no indication of thought of harm to self or others. *Id.*   Cross described frustration with having been denied Social Security benefits, as well as the medical and psychological needs of his mother due to the recent death of his father. *Id.*   Cross expressed feeling overwhelmed by his mother's needs and her insistence that he provide care for her. *Id.*   Ms. Schacherer discussed the importance of balancing his mother's demands with his own needs. *Id.* No future sessions were scheduled, and Cross was to call as needed. *Id.*

On September 24, 2012, Cross appeared at the emergency room complaining of shortness of breath and wheezing, beginning about two hours prior to his arrival. *Id.* 539-40.   He denied any known reason for the exacerbation of his COPD. *Id.* 540.   The impression was Cross had an exacerbation of his COPD, but with an impressive reversal in the emergency room following treatment. *Id.* 542.

On September 27, 2012, Cross presented at the Pain Management Clinic. *Id.* 538.   He reported pain in the cervical region radiating into his right arm and the thoracic region. *Id.*   He further reported he does not always take his Percocet for pain because he gets lethargic if he takes it every day. *Id.* 539.   Physicians Assistant Thomas Esser discussed chiropractic care, a follow up in one month and prescribed Oxycodone, physical therapy and a soft collar brace. *Id.*

On October 26, 2012, Cross had a CT of his cervical spine. *Id.* 482.   Impressions included an anterior fusion at C5-C7, cervical spondylosis, no acute fracture or dislocation was observed, no significant soft tissue abnormalities were observed, and no compromise of the spinal canal was identified. *Id.* 483-84.

On December 14, 2012, Cross presented at the Pain Management Clinic and reported pain in his right shoulder, cervical, thoracic and lumbar regions. *Id.* 530-31.   He indicated Oxycodone was not helping with the pain but Percocet was. *Id.* 531.   The plan was for Cross to increase his Oxycodone, obtain a CT scan, and follow through with a chiropractor. *Id.*

On January 18, 2013, Cross met again with Psychiatric NP Watson. *Id.* 520.   She noted Cross was seen at the clinic for continued psychiatric management and supportive psychotherapy for major depressive disorder, recurrent, having last been seen on August 29, 2012. *Id.*   Cross reported his mood varies with his pain levels, was pleased to find out his first grandchild is a girl, and reported he was coping well with his father's death in July. *Id.*   He further reported he was taking his psychiatric medications and was sleeping 8 to 10 hours a day, and his appetite was okay. *Id.*   He also reported his energy to be low, and he exercises as he was able, with intermittent anxiety. *Id.* 520-21.   NP Watson noted Cross appeared neatly groomed, cooperative, with good eye contact, his mood was neutral, and anxiety controlled with good insight and judgment. *Id.* 523. NP Watson's impressions were that Cross has adjustment disorder with anxiety, chronic stressors, major depressive disorder recurrent with anxiety. *Id.*   Cross was directed to continue with individual psychotherapy and follow-up in four months. *Id.* 524.

On January 18, 2013, Cross was seen in the primary care outpatient clinic by Dr. Nisha Patel. *Id.* 524.   He reported a history of chronic pain in his neck and back, and new pain in his knee and right hip. *Id.* 525.   Cross indicated no fall or injury. *Id.*   Dr. Patel noted Cross had moderate obstruction due to COPD, coronary artery disease but no chest pain, and he was still working on quitting smoking. *Id.* 526.   He was not a candidate for anti-inflammatory medication for his right hip and knee pain due to other medications. *Id.*   Because Cross did not want a cortisone injection, physical therapy was his best option. *Id.*

On April 9, 2013, Cross reported to the emergency room with shortness of breath, indicating he became short of breath the night before, such that he was unable to lie down all night. *Id.* 514.   It was noted that after being in the emergency room for a short while with multiple complaints, Cross was sitting, playing solitaire on his phone. *Id.* 516.   Impressions from a head CT were that Cross had no acute intracranial process, and mild bilateral ethmoid sinus disease. *Id.*

Impressions from a chest x-ray included minimal left basilar atelectasis, stable right lower lobe nodule, hyperinflation was unchanged, and no specific acute abnormality otherwise. *Id.* 476. Cross was given steroids to treat COPD exacerbation, and nebulizer treatment. *Id.* 517.   Dr. Shelley Jones thought Cross had a component of anxiety to his shortness of breath, and further noted low potassium. *Id.*

On June 13, 2013, Cross met again with Psychiatric NP Watson. *Id.* 507.   She noted Cross was last seen on January 18, 2013, and failed to appear at an appointment scheduled for May 23, 2013. *Id.*   Cross reported he was sleeping well, denied depressive symptoms, his appetite was good, and energy reported as adequate. *Id.*   He continues to exercise as able and reported rare anxiety. *Id.*   He denied suicidal ideation, thoughts or plans, and denied psychotic or manic symptoms. *Id.*   NP Watson noted Cross was neatly groomed, cooperative with good eye contact, his mood was neutral, his anxiety was controlled, his insight and judgment were good. *Id.* 509. She further noted Cross' gait was within normal limits "without sway, no evidence of psychomotor abnormality." *Id.*   She diagnosed an adjustment disorder with anxiety resolving, chronic stressors, and major depressive disorder recurrent with anxiety. *Id.* 510.   The treatment plan for Cross was to continue with his medications for anxiety and depression, and resume or continue appointments for individual psychotherapy, following up with NP Watson in five months. *Id.*

On July 10, 2013, Cross had an appointment for a cardiology consultation. *Id.* 502-06. Nurse Practitioner Audrey Hiatt noted Cross' smoking had increased over the past year. *Id.* 502. Cross denied chest pain, pressure or tightness, and reported he had frequent coughing. *Id.*   NP Hiatt noted her impression of Cross having a history of coronary artery disease, and coughing frequently, secondary to his COPD. *Id.* 505.   She recommended Cross return in a year for an appointment and an EKG, and noted his low potassium and referred him to treatment and evaluation by his regular doctor. *Id.* 506.

Cross had another chest x-ray on July 12, 2013. *Id.* 474.   Impressions included obstructive lung disease, generalized arteriosclerosis with coronary artery calcification, granuloma in the right lower lobe, scarring in the right middle lobe, no acute radiographic abnormality involving the thorax, liver and adrenal glands are intact, spondylosis in the thoracic vertebral column, and old granulomatous changes in the mediastinum. *Id.* 475.

On September 7, 2013, Cross went to the emergency room complaining of shortness of breath. *Id.* 499.   A chest x-ray showed no evidence of an acute cardiopulmonary abnormality. *Id.* 472-73.   Cross was administered steroids and discharged after receiving treatment with improved condition and in no acute distress. *Id.* 501-02.   Cross had another chest x-ray on October 29, 2013. *Id.* 471.   Impressions included spondylosis and kyphosis in the thoracic vertebral column, obstructive lung disease, granulomas in the hilar and perihilar regions with a stable granuloma in the right lower lung zone, and no acute infiltration, effusion or congestion involving the thoracic. *Id.* 471-72.

## B.   Records of Agency Proceedings

### 1.   Testimony of Tracy A. Cross

Cross presented testimony to the ALJ on November 13, 2013. A.R. 554-75.   At the time he was 52 years of age, married and living with his spouse. *Id.* 554.   Cross completed high school, and attended some college, but did not have any post-high school degree. *Id.* 554-55.   He served in the National Guard from 1979 to 1981, and was on active duty from June 1981 to December 1984. *Id.* 555.   Cross last attempted to work in the spring and summer of 2013, doing subcontract work for a former employer at the Iowa State Fair, driving a pick-up that carried a fuel can for lawn equipment. *Id.* 556.   Prior to that, he was an assistant manager at the Iowa Event Center parking lot, with approximately 12 employees under his supervision. *Id.* 557.   Cross indicated he worked there approximately three months, but stopped because he was having issues with pain and

headaches. *Id.*

Cross continued to discuss, briefly, his prior positions with the ALJ. *Id.* 557-62.   His previous work included installing fire control systems in commercial buildings for approximately two years. *Id.* 557-58.   According to Cross, he started having issues with pain. *Id.* 558.   Prior to that, Cross worked at a company overseeing nightly parking lot maintenance, cleaning and snow plowing for approximately three years. *Id.*   That employment ceased when the company closed. *Id.*   Cross worked for the Des Moines School District, driving a school bus, until he had a work injury. *Id.* 558-59.   He also worked at the Methodist Hospital, cleaning offices for a very short period of time, as well as with Servpro, overseeing crews doing fire, smoke and water damage, clean up and restoration. *Id.* 559.   That job ended when Cross wanted to renegotiate his salary, and his supervisor did not want to pay him more. *Id.*   Cross worked for a short period of time at Ace Hardware, and also as a store manager of a convenience store. *Id.* 559-60.   For a period of time, Cross also attempted to start his own business doing similar work to the work he did at Servpro, but ended up losing money and closing the business. *Id.* 560-61.

Cross is supported by his wife's employment, and he also receives partial disability benefits from the Veterans Administration, which began in the early 2000s. *Id.* 562.   On a typical day, Cross first does his breathing treatment before he does anything else, as well as taking his medications. *Id.*   Cross will feed the cat, watch the news, and usually ends up taking a pain pill and going back to sleep for several hours. *Id.*   He does very basic meal preparation, does not help with any cleaning of the house he shares with his wife, does not do laundry, and does not do any outside work. *Id.* 562-63.   Cross also does not do grocery shopping, drives only when his wife cannot drive him, and visits with family or neighbors only once in a while. *Id.* 563.   He does not have any hobbies or things that are of interest. *Id.* 564.   Cross no longer goes fishing like he used to in 2012, and will read the newspaper once in a while. *Id.*

Cross testified that, in 2011, he would stay home on oxygen by himself during the day, only occasionally preparing food in the microwave, watching television, and driving occasionally to go to doctors' appointments. *Id.* 564-65.   He estimated he would sleep approximately 16 to 18 hours a day. *Id.* 565.   Cross indicated he currently smokes about three-quarters a pack of cigarettes per day and explained he has tried to quit smoking, doing any number of things, including patches, hypnosis, and smoking cessation classes. *Id.*   He is in the process of setting up acupuncture to try to help with his efforts to stop smoking. *Id.*   The longest Cross has been able to quit was for three months following his hospital stay in 2011. *Id.* 566.   Cross described he had a nerve stimulator planted in the back of his neck in December 2011 for chronic neck pain and headaches. *Id.*   Cross testified it was a long process for the VA to approve the stimulator, and the pain was present prior to September 30, 2011. *Id.* 567.

Cross worked and was paid $12 an hour in the summer of 2013 for driving a pick-up around the Iowa State fairgrounds, assisting workers who were cleaning up the fairgrounds in the evening. *Id.*   His duties were to drive around and make sure the workers had gas in their backpack blowers as they cleaned up the state fair. *Id.*   Cross worked only about three days for two hours a night, testifying that that is all he could handle. *Id.*

Cross and his wife live in a two-story house, with his bedroom on the main floor. *Id.*   He does not go upstairs or to the basement of the house. *Id.* 567-68.   In terms of his activities of daily living, Cross indicated that in 2012 he would fish occasionally, walking 300-400 feet to get to the lake and fish from the bank, only carrying his fishing pole. *Id.* 568.   Since 2011, he has not lifted much more than a half-gallon of milk, and is only able to stand at one time for approximately 15-20 minutes, depending upon his pain. *Id.*   Cross indicated when he stands for a long period it starts to exacerbate the pain in his neck and his head due to the surgery he previously had. *Id.* 569.   He is not able to hold his head in the same position for very long, nor can he sit for very long. *Id.* 569-

70.   Cross indicated he did not believe there was much deterioration in his condition between the fall of 2011 and 2012. *Id.* 570.

Cross has three inhalers and a nebulizer, which he has been using since 2011. *Id.*   He uses the nebulizer approximately every four hours. *Id.*   Cross had a nerve stimulator planted in his neck after September 2011, which improved his neck pain. *Id.* 571.   He takes Baclofen for muscle spasms, Oxycodone for pain, Citalopram for mood, Clonazepam for anxiety, Venlafaxine for mood and anxiety, Trazodone for sleep, Carvedilol for his heart, Plavix for his heart, Emdor for his heart, nitroglycerin for his heart, Spiriva, and Albuterol inhaler. *Id.* 571-72.   Cross described he has had some heart palpitations with the Albuterol, and his doctors have been switching that around. *Id.* 572.

Cross indicated that between his physical condition, pain, side effects of his medication and depression he does not believe he could mentally focus on unskilled sedentary work 5 days a week, 8 hours a day. *Id.* 573-74.   He explained that if he starts feeling pain he turns on his nerve stimulator and he will have relief but if he does not turn the stimulator on, because he does not feel the pain coming, the pain will hit him and then he would be down. *Id.* 574.   Even with the nerve stimulator, Cross indicated he could not be at a work station 8 hours a day for 5 days a week. *Id.* Cross indicated he cannot focus long enough to read or use the internet. *Id.*

### 2.   Testimony of Vocational Expert

A vocational expert ("VE"), Elizabeth Albrecht, also testified at the hearing on November 13, 2013. A.R. 576-80.   The ALJ presented an initial hypothetical for an individual of Cross' age education and work experience, presuming that the individual could lift and/or carry, push and/or pull 20 pounds occasionally and 10 pounds frequently, assuming the individual can stand/walk for 6 hours in an 8-hour work day, and sit with normal breaks for 6 hours in an 8-hour work day, can balance, stoop, kneel, crouch, crawl and climb ramps and stairs occasionally, and cannot climb

ladders, ropes or scaffolds. *Id.* 577.   Additionally, the ALJ asked the VE to assume the individual could not work in environments with concentrated exposure to extreme cold or humidity, or with concentrated exposure to fumes, dust, gases, noxious odors or chemicals. *Id.*   The ALJ inquired as to whether that would allow for any of the past occupations. *Id.*   The VE testified there appeared to be two previous jobs of Cross that could be done as cashier and retail store supervisor. *Id.* 578.

The ALJ added to the hypothetical that the individual would be limited to simple routine and repetitive tasks. *Id.*   The VE testified that would eliminate the retail store supervisor, but the cashier for self-service gasoline would remain. *Id.*   The ALJ further inquired under that hypothetical whether other occupations would be available, and the VE responded that other jobs would be unskilled light work including a small products assembler, marker and shipping and receiving weigher. *Id.*

Cross' attorney inquired of the VE with all of the other factors being the same, if the claimant is limited to lifting 5 pounds occasionally, 2 pounds frequently, sitting 30 minutes at a time for a total of 3 hours a day, standing, walking for 15 minutes for 2 hours a day, would there be any jobs, either with past work or other work, available. *Id.* 579.   The VE responded that the hypothetical poses a job of being sedentary or less than sedentary, and with only 5 hours of standing, walking and sitting in a day, it would preclude all work. *Id.*   On further questioning from Cross' attorney, the VE testified that absences of 3 days or more per month would preclude all employment. *Id.* 579-80.

### 3.   Decision of Administrative Law Judge

Administrative Law Judge Tela Gatewood issued a decision (A.R. 11-24) on January 30, 2015, as to whether Cross had a disability within the meaning of the Social Security Act.   The ALJ noted Cross' prior applications for benefits ending in an unfavorable decision on October 15, 2010. *Id.* 11.   The ALJ further noted Cross' last met the insured status requirements for benefits

on September 30, 2011, and, therefore, Cross must establish disability on or before that date. *Id.*

12.   After a written analysis, the ALJ concluded Cross was not disabled from October 16, 2010,

through September 30, 2011. *Id.* 12, 24.

In doing so, ALJ Gatewood followed the five-step sequential evaluation process

established by the Social Security Administration for determining whether an individual is

disabled. *Id.* 12-14.[2]   First, the ALJ found Cross "did not engage in substantial gainful activity"

from October 16, 2010, through September 30, 2011. *Id.* 14.   Second, the ALJ found that, through

September 30, 2011, Cross "had the following severe impairments: chronic objective pulmonary

disorder, status post fusion of the cervical spine, and valvular heart disease." *Id.*   In the ALJ's

opinion, Cross did not have a severe mental health impairment from October 2010 through

September 2011. *Id.* 15.   The ALJ explained:

---

[2]  *See* 20 C.F.R. § 404.1520; *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011).

> Step one determines whether the claimant is involved in substantial gainful activity.
> §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If so, the claimant is not disabled; if
> not, step two determines whether the claimant has a "severe" medically
> determinable impairment (or combination of impairments). §§ 404.1520(a)(4)(ii),
> (c); 416.920(a)(4)(ii),(c). If there is no severe impairment, the claimant is not
> disabled; if there is, step three determines whether the impairments are severe
> enough to meet a predetermined list of conditions (with duration requirements). §§
> 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d). If so, the claimant is disabled; if not,
> step four considers the residual functional capacity of the claimant - previously
> determined by the ALJ - and evaluates whether the claimant has the residual
> functional capacity to complete his or her past relevant work. §§
> 404.1520(a)(4)(iv),(f); 416.920(a)(4)(iv),(f). If the claimant can complete past
> relevant work, the claimant is not disabled; if not, step five considers the claimant's
> residual functional capacity, age, education, and work experience to determine
> whether the claimant can do other work. §§ 404.1520(a)(4)(v),(g);
> 416.920(a)(4)(v),(g). If so, the claimant is not disabled; if not, the claimant is
> disabled.

*Cuthrell v. Astrue*, 702 F.3d 1114, 1116-17 (8th Cir. 2013); *see also Jimmerson v. Astrue*, 717

F.Supp.2d 840, 856 (S.D. Iowa 2010) (setting forth five-step evaluation).

The medical evidence does not establish a post-traumatic stress disorder or anxiety as a diagnosed condition from an acceptable medical source during the period in question, which lasted twelve or more consecutive months. The claimant's depression, single episode, was listed as in remission by July of 2011.

*Id.*   Third, the ALJ found Cross "did not have an impairment, or combination of impairments, which meets or medically equals the severity of one of the listed impairments." *Id.*   Specifically, the ALJ determined Cross did not meet the requirements for a listed musculoskeletal, cardiovascular, respiratory or mental impairment. *Id.* 15-16.   Those first three steps are not explicitly being challenged by Cross in this judicial review.

At the fourth step, which is at issue, ALJ Gatewood determined Cross had the residual functional capacity through September 30, 2011,

to perform a range of light work as defined in 20 CFR 404.1567(b). The claimant could lift and/or carry and push and/or pull twenty pounds occasionally, ten pounds frequently. He could stand and/or walk, with normal breaks, for a total of six hours in a workday. He could sit, with normal breaks, for a total of six hours in a workday. The claimant could balance, stoop, kneel, crouch, crawl, and climb ramps or stairs occasionally. He could not climb ladders, ropes, or scaffolds. The claimant could not work in an environment with concentrated exposure to extreme cold, humidity, fumes, dust, gasses, noxious odors, or chemicals.

A.R. 17.[3]   The ALJ indicated all of Cross' subjective allegations of pain and other symptoms were considered but found his "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." *Id.* 18-19.   The ALJ examined Cross' history of treatment for lung disease, coronary artery disease, and back and neck pain but found "the medical

---

[3] The Social Security Administration classifies jobs as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567.   Light work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

evidence, from October 16, 2010, through September 30, 2011, failed to provide strong support for [Cross'] allegations of disabling symptoms." *Id.*   The ALJ also considered the medical records for treatment after September 30, 2011, but determined the evidence did not warrant any change to Cross' residual functional capacity prior to that date. *Id.* 19.   In addition, the ALJ considered the medical opinions in the record, specifically addressing in detail the functional capacity evaluation completed by PT Blankespoor and the report of Dr. Bansal. *Id.* 20-21.   The ALJ gave the evaluation of PT Blankespoor "some weight" and opinions of Dr. Bansal "little weight" for reasons set forth in the decision. *Id.*   The ALJ also gave "some weight" to the opinions of the state agency's medical consultants from August and October of 2012. *Id.* 21-22.   Based on those assessments and the resulting RFC, the ALJ found Cross, through September 30, 2011, "was capable of performing past relevant work as a parking cashier supervisor." *Id.* 22.

At the fifth step, after considering Cross' age, education, work experience, and residual functional capacity, ALJ Gatewood found there are jobs that exist in significant numbers in the national economy that Cross can perform. *Id.* 23-24.   The ALJ relied upon the testimony of the vocational expert that, hypothetically, such an individual would be able to perform the requirements of representative light, unskilled occupations such as an assembler of small products, a shipping and receiving weigher, and a marker. *Id.* 23.   Thus, ALJ Gatewood concluded Cross "was not under a disability, as defined in the Social Security Act, at any time from January 1, 2008, the alleged onset date, through September 30, 2011, the date the claimant last met the insured status requirements for disability insurance benefits." *Id.* 24.

### IV. JUDICIAL REVIEW OF DECISION

**A.   Standard of Review**

When performing judicial review, "[t]he court's task is to determine whether the ALJ's decision 'complies with the relevant legal requirements and is supported by substantial evidence

in the record as a whole.'" *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008)); *see also*, *e.g.*, *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (court "'will affirm the ALJ's findings if supported by substantial evidence on the record as a whole'") (quoted citations omitted)).   "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971) (Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))).

The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell*, 702 F.3d at 1116 (quoting *Perkins*, 648 F.3d at 897).   Thus, "[e]ven if substantial evidence supports a contrary outcome, [the court] may not reverse so long as the Commissioner's decision also is supported by substantial evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004).   Stated in other words, the court

> will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotations and citations omitted)).   The court may reverse the ALJ's decision if it is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001).   "Legal error may be an error of procedure, the use of

erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal citations omitted).

**B.   Analysis of Cross' Arguments**

As presented in his brief, Cross makes two principal arguments: (1) the residual functional capacity assessment is flawed because the ALJ failed to evaluate properly the work related limitations opined by Dr. Bansal; and (2) the ALJ's decision is not supported by substantial medical evidence.   Although not specifically raised in his brief, Cross' assertions within his Complaint that the ALJ posed an inadequate hypothetical question to the vocational expert and improperly rejected his subjective complaints have also been considered and will be addressed below.   On all points, Cross urges this Court to reverse the ALJ's decision and enter judgment under 42 U.S.C. § 405(g).   Cross insists this matter should be remanded for the calculation and payment of benefits or, alternatively, remanded for further proceedings.

The Commissioner, on the other hand, contends the ALJ properly assessed Cross' residual functional capacity based on all of the relevant evidence, including the opinions from the medical sources who treated, examined, and evaluated Cross and his impairments.   In the Commissioner's view, the ALJ provided sufficient reasons for giving Dr. Bansal's opinions little weight.   Any error by the ALJ in assessing those opinions, according to the Commissioner, was harmless.   The Commissioner asserts there is substantial evidence in the record as a whole supporting the ALJ's decision and, therefore, this Court should affirm.

After considering the assertions of Cross, and upon an independent review of the Administrative Record, this Magistrate Judge finds there are insufficient grounds for either reversal of the ALJ's decision or remand for further proceedings.   Instead, the decision appears to comply with the requisite law and is supported by substantial evidence.   Although there is also evidence in the record supporting the claims of Cross, the ALJ's decision falls within the available

zone of choice and, therefore, should not be disturbed by this Court.

### 1.   Determination of Residual Functional Capacity

An individual has a disability within the meaning of the Social Security Act if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. § 1382c(a)(3)(A)); *see also* 42 U.S.C. § 416(i). When determining whether a claimant can engage in substantial employment, the ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's residual functional capacity ("RFC"). *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003).   It is a function-by-function assessment of an individual's ability to do work-related activities despite his or her physical or mental limitations. *See, e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); *Roberson v. Astrue,* 481 F.3d 1020, 1023 (8th Cir. 2007); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004). In other words, "[a] claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence." *McCoy*, 648 F.3d at 614; *see also Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); 20 C.F.R. § 404.1545.

Residual functional capacity "is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (quoting *Lauer*, 245 F.3d at 704); *see also Martise*, 641 F.3d at 923.   "[I]t is the responsibility of the ALJ, [however,] not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).   "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785,

793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. §§ 404.1545, 416.945 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

"The ALJ bears the primary responsibility for determining a claimant's RFC . . . . However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Martise*, 641 F.3d at 923 (citation and internal quotation marks omitted); *see also Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) ("The claimant has the burden to establish [her] RFC."); *Moore*, 572 F.3d at 523 ("The claimant has the burden of proof to show she is disabled through step four."); *Baldwin*, 349 F.3d at 556 ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC.").

In this case, ALJ Gatewood determined Cross had the residual functional capacity through September 30, 2011,

> to perform a range of light work as defined in 20 CFR 404.1567(b). The claimant could lift and/or carry and push and/or pull twenty pounds occasionally, ten pounds frequently. He could stand and/or walk, with normal breaks, for a total of six hours in a workday. He could sit, with normal breaks, for a total of six hours in a workday. The claimant could balance, stoop, kneel, crouch, crawl, and climb ramps or stairs occasionally. He could not climb ladders, ropes, or scaffolds. The claimant could not work in an environment with concentrated exposure to extreme cold, humidity, fumes, dust, gasses, noxious odors, or chemicals.

A.R. 17.   This determination was supported by a thorough written analysis by ALJ Gatewood which reflects the required assessment of the entire evidentiary record including the testimony of Cross as to his mental and physical limitations and the medical records for treatment of his impairments. *Id.* 17-20.   The ALJ also considered the medical opinion evidence contained in the record. *Id.* 20-22.   As such, the ALJ's assessment of Cross' residual functional capacity was properly based on the relevant evidence in the case record. *See Goff*, 421 F.3d at 793; 20 C.F.R. §§ 404.1545, 416.945.

Cross contends, however, that the RFC assessment is flawed because the ALJ failed to

properly evaluate the work related limitations opined by Dr. Bansal. Dkt. 10 pp. 16-21.   He notes

the following differences between the ALJ's RFC and Dr. Bansal's opinions:

> The ALJ found Mr. Cross could stand and walk 6 hours a day; Dr. Bansal limited
> Mr. Cross to standing and walking 15 minutes at a time for a total of 2 hours in an
> 8 hour workday. The ALJ found Mr. Cross could sit for 6 hours a day with normal
> breaks while Dr. Bansal found Mr. Cross sit for 30 minutes at a time for a total of
> 3 hours a day. Dr. Bansal concluded Mr. Cross needed to change positions and be
> absent 3 times a month; the ALJ did not include the need for positional changes or
> absences. Dr. Bansal also found Mr. Cross could reach and handle fifteen minutes
> at a time for a total of about two hours out of an eight hour workday. He could
> finger for thirty minutes at a time and a total of four hours a day. The ALJ did not
> impose any limitations on Mr. Cross's ability to reach, handle, or finger.

*Id.* pp. 18-19.   Cross emphasizes the limitations opined by Dr. Bansal were based upon and

consistent with the functional capacity evaluation by PT Blankespoor. *Id.* pp. 19-21.   Cross asserts

the physical therapist's testing and observations confirms the limitations in his ability to sit, stand

and walk and the significant deficits in his muscle strength, range of motion, and grip and pinch

strength which affects his ability to reach, handle and finger. *Id.* pp. 20-21.   Cross further asserts

the opinions of Dr. Bansal are supported by his treatment records prior to September 30, 2011. *Id.*

pp. 22-23.   He cites to the Compensation and Pension Examinations in May 2010 relating to

peripheral neuropathy in his arms and cervical spondylosis, and to his emergency room visit on

March 9, 2011, followed by his subsequent treatment for hospital-acquired pneumonia, ARDS and

COPD exacerbation. *Id.*   He also refers to a list of medications he was taking in 2011 as support

for Dr. Bansal's proffered limitations:

> Baclofen (a muscle relaxant), Oxycodone (pain), Trazodone (sleep), venlafaxine
> (depression),  Benzonaate  (cough/COPD),  Carvedilol  (heart),  Citalopram
> (depression), Clonazepam (anxiety), Clopidogrel (heart), Guaifenesn (cough),
> Docusate (bowels), gemfibrozil (triglycerides), Isosorbide (lungs), Levalbuterol
> (lungs), Loratadine (allergies), Nicotine gum (smoking cessation), Nitroglycerin
> (heart), ranitidine (stomach), Rosuvastatin (cholesterol), and Tiotropium (lungs).

*Id.* p. 23.

ALJ Gatewood explicitly addressed the physical therapist's evaluation and Dr. Bansal's

opinions within the context of the RFC assessment.   Indeed, a fairly significant portion of the

written analysis focused on those matters beginning with PT Blankespoor:

> A Work Well Functional Capacity Evaluation was completed in June of 2012 (Exhibit C1F). Notably, this is well after the claimant's date the claimant last met the insured status requirements for disability insurance benefits, which was September 30, 2011. Mark Blankespoor, a physical therapist, completed the evaluation. Mr. Blankespoor opined that the claimant was able to lift up to fifteen pound on a rare basis and up to five pounds on an occasional basis. He stated the claimant's capabilities were within the sedentary category; the claimant would have significant difficulty with performing work tasks on a full-time basis. He would not be able to perform lifting, carrying, sitting, standing, walking, coordination or positional tasks on a continuous, day after day basis safely. Mr. Blankespoor opined that the claimant was "significantly limited in his function previous to October of 2010." It is not entirely clear if Mr. Blankespoor's opinion was that his proposed limitations applied in full prior to October of 2010 (Exhibit C1F, p. 2).

> The therapist stated that the opinion was based on his review of the medical records, although it was not stated what records the therapist saw (Exhibit C1F, p. 2). It is noted that the opinion of a physical therapist is not a medical source opinion, but is treated as a third-party opinion. Regardless, his opinions are given only some weight, as they are not fully supported by the medical evidence documenting symptoms, treatment, and limitations, from October 16, 2010, through September 30, 2011. The claimant's attorney made the referral to the physical therapist (Exhibit C1F, p. 1). The therapist provided no indication of the claimant's degree of effort made during the evaluation. As noted above, the claimant demonstrated normal muscle tone, strength, and range of motion during another examination during the relevant period. He received only conservative treatment for his conditions, which appeared to be effective.

A.R. 20.   Then, in regard to Dr. Bansal, the ALJ wrote as follows:

> Sunil Basal, M. D., responded to a letter from the claimant's attorney in June of 2012. In the attorney's letter, it states that the claimant has two claims, one covering 2009 through October 15, 2010 (i.e., the date of the immediate prior Unfavorable Decision), and one covering October 16, 2010, to the present. Again, medical records were enclosed, although it was not identified, which medical records were included. It was stated that the evaluation at Work Well was included (Exhibit C2F, p. 1). Further, the responses suggest additional documentation not submitted to the Social Security Administration. Dr. Basal stated the claimant needed continued psychiatric treatment, as well as treatment for his chronic neck and back pain. He stated the claimant likely would need additional medications, injections, physical therapy, and a home exercise program for the rest of his life to help resolve his strength, mobility, and pain issues. He reported the claimant would likely be a candidate for coronary artery bypass grafting surgery in the near future as well as carotid bypass. He stated the claimant's advancing spondylosis might require future decompression surgeries to more distal areas of the spine (Exhibit C2F).

Dr. Basal was asked what the claimant's current limitations and ability to perform work related activities were. Dr. Basal stated that he agreed with the functional capacity evaluation performed on June 13, 2012. He stated the claimant's capabilities were in the sedentary category. Dr. Basal opined that the claimant's work-related limitations for the period, from October 16, 2010, to the time of his statement, appeared to be consistent with his medical conditions. Dr. Basal opined that the claimant was not an appropriate candidate for spinal cord stimulation and noted that he had been referred for further mental health services in July of 2010. He referenced a diagnosis from Dr. Graham, from July of 2010, which included a panic disorder with agoraphobia, a major depressive disorder, and a pain disorder associated with both psychological factors and a general medical condition. Dr. Basal offered additional limitations regarding the claimant's ability to stand, walk, lift, and carry. Dr. Basal's opinions regarding functional limitations are given little weight (Exhibit C2F). There is no evidence that Dr. Basal ever saw the claimant. The opinion of Dr. Basal appears to be presented similar to testimony from a medical expert (of the claimant's own choosing), without benefit of the doctor being under oath or subject to examination.

From October 16, 2010 through September 30, 2011, the record reflects minimal complaints of mental health symptoms. The claimant did not appear to be receiving intensive mental health treatment during the relevant period. His depression was noted to be in remission in July of 2011. His reference to his "attitude" could be corrected, if the claimant had full motivation to work. Likewise, the claimant reported he had not followed up with cardiology in two years, at an examination, in June of 2012, which indicated his cardiac symptoms had been stable. For all such reasons, the statement of Dr. Basal, dated nearly nine months after the claimant last met the insured status requirements for disability insurance benefits, is given little weight.

*Id.* 21.

Cross contends ALJ Gatewood rejected the report of Dr. Bansal for "spurious reasons."

Dkt. 10 p. 3.   First, he challenges the ALJ's statement that "[t]here is no evidence that Dr. Basal

[sic] ever saw the claimant." A.R. 21.   Cross cites to the opening statement of his counsel at the

hearing wherein he noted:

And the reports from Dr. Bansil [sic] and Dr. Blankenspore [sic] are based on objective evidence. They're based on personal examination not like the DDS evaluations.

*Id.* 554.   Cross also cites to his own testimony when he responded "Yes" to the question: "Do you

remember going to see Dr. Bansil [sic] and the physical therapist in June/July 2012?" *Id.* 570.   On

this point, Cross argues Dr. Bansal was an "examining physician" whose opinions should be given greater weight than opinions of a medical source who had not examined the claimant. Dkt. 10 p. 16, 24. Cross further states in his brief "Dr. Bansal's conclusions are the result of a *comprehensive physical examination* and review of a number of medical records." *Id.* p. 19 (emphasis added).

It is correct that, in general, more weight is given "to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1); *see also Wright v. Colvin*, 789 F.3d 847, 852-53 (8th Cir. 2015) ("opinions of examining medical professionals are given more weight than nonexamining medical professionals"). The Commissioner concedes Dr. Bansal appears to have "seen" Cross in his office but argues it does not appear Dr. Bansal actually "examined" Cross. Dkt. 11 p. 9. The point is well-taken.

Upon review of the record, there is no evidence of Dr. Bansal performing a "comprehensive physical examination" of Cross. Instead, it appears from a fair reading of Dr. Bansal's report he relied significantly on the evaluation by the physical therapist, along with other prior medical records, to form his opinions. For example, when asked to opine upon "Cross's current limitations and his ability to perform work related activities on a sustained basis," Dr. Bansal responded:

> I would agree with the functional capacity evaluation, done on June 13, 2012. The therapist's recommendations regarding return to work are consistent with the US Department of Labor physical demand level of light work, with restrictions listed in the FCE recommendations.

A.R. 313-14. Dr. Bansal then identified additional restrictions but without any referral to or notation of his own physical examination of Cross. *Id.* Indeed, the only indication within the report that Cross was seen by Dr. Bansal in person appears to be the notation that "Mr. Cross displayed the same unsteady gait in my office which was noted in the FCE." *Id.* 316.

In this Magistrate Judge's opinion, while the ALJ's statement that there is no evidence that Dr. Bansal "ever saw the claimant" may be incorrect, the error does not render the ALJ's overall assessment of Dr. Bansal's opinions invalid or warrant reversal of the decision or remand for further proceedings.   The record fails to show that a "comprehensive" or any examination of substance was performed by Dr. Bansal.   And even if an examination occurred, there is no evidence of the specific nature and results of such examination.   One would expect Dr. Bansal to refer to the results of his own examination in support of his proffered opinions.

Despite this lack of evidence, Cross argues the ALJ's error in believing "Dr. Bansal was a non-examining physician when, in fact, Dr. Bansal had personally evaluated" him was prejudicial and not harmless. Dkt. 12 p. 3.   Cross believes this matter should be "remanded for a proper evaluation of Dr. Bansal's report and conclusions." *Id.*   In support, he cites to *Dewey v. Astrue*, 509 F.3d 447 (8th Cir. 2007) where the Eighth Circuit remanded the case for rehearing because the ALJ "erroneously relied on the opinion of a person with *no medical credentials* as a medical consultant." *Id.* at 448 (emphasis added).   Upon this Magistrate Judge's reading of the decision, and due to the distinguishable circumstances here, it provides insufficient support for remanding this case to reevaluate the opinions of Dr. Bansal.

Moreover, in *Wright*, the Eighth Circuit affirmed the ALJ's decision denying benefits even though little weight was given to an opinion of a doctor whom the ALJ mistakenly classified as a nonexamining physician. *Wright*, 789 F.3d at 853.   There, it was undisputed that the doctor "*did base his opinion on a physical examination.*" *Id.*   Nevertheless, the Eighth Circuit affirmed because there was substantial evidence in the record to support the ALJ's finding that the opinion was not consistent with other objective medical evidence. *Id.* (citing *Perkins*, 648 F.3d at 897 ("An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating

physician renders inconsistent opinions that undermine the credibility of such opinions." (quotation and citation omitted))). Such is the case here, especially as to the medical evidence prior to September 30, 2011.

Cross also challenges the ALJ for asserting it was not clear what evidence Dr. Bansal reviewed. Dkt. 10 p. 24. Cross argues "[t]he ALJ could easily have asked Mr. Cross or counsel at hearing what evidence was reviewed." *Id.* In Cross' view, "[t]here is something unseemly about the ALJ's failure to inquire at hearing." *Id.* The Commissioner, however, contends the ALJ's reference to lack of specificity regarding the records submitted to and relied upon by Dr. Bansal was "well-founded." Dkt. 11 p. 9.

This Magistrate Judge agrees with the Commissioner. In the written decision, ALJ Gatewood noted:

> Sunil Basal, M. D., responded to a letter from the claimant's attorney in June of 2012. In the attorney's letter, it states that the claimant has two claims, one covering 2009 through October 15, 2010 (i.e., the date of the immediate prior Unfavorable Decision), and one covering October 16, 2010, to the present. Again, medical records were enclosed, although it was not identified, which medical records were included. It was stated that the evaluation at Work Well was included (Exhibit C2F, p. 1). Further, the responses suggest additional documentation not submitted to the Social Security Administration.

A.R. 21. The statements by the ALJ appear to be accurate. There is no indication in the report as to the specific medical records provided to Dr. Bansal. *Id.* 312. It is also noteworthy that Cross' counsel explicitly asked Dr. Bansal to "please refer to the medical records using the exhibit number in red in the upper left hand corner of the report." *Id.* But Dr. Bansal did not comply by either using exhibit numbers or explicitly referencing certain medical records. For example, when asked whether "the objective medical evidence [is] reasonably consistent with Mr. Cross' subjective allegations," Dr. Bansal responded in entirety as follows:

> Yes. There is clear correspondence between his stated medical history and the medical records. Moreover, it is substantiated by a clear medically logical progression. On physical exam testing, his range of motions were very consistent

across 3 trials, a feat very hard to achieve if one is malingering.

*Id.* 315.

In this Magistrate Judge's opinion, the ALJ's statement that the medical records provided to Dr. Bansal were not identified is not only correct but was properly noted within the decision. Further, the characterization of the ALJ as being "unseemly" in not inquiring about the issue at hearing is unsupported. Cross' argument on this point falls well-short of providing a valid basis to reverse the decision or remand for further proceedings.

Cross also challenges the following statement by ALJ Gatewwod as improper:

The opinion of Dr. Basal [sic] appears to be presented similar to testimony from a medical expert (of the claimant's own choosing), without benefit of the doctor being under oath or subject to examination.

*Id.* 21. Cross argues the statement is contrary to the Commissioner's policy that medical reports are usually sufficient to document medical findings and assessments. Dkt. 10 p. 24. In addition, Cross takes issue with the phrase "of the claimant's own choosing" as indicating the ALJ believed Dr. Bansal was biased. *Id.* p. 25. Cross contends that "[h]ad the ALJ been interested in finding the truth, the ALJ could have developed the record by submitting interrogatories to Dr. Bansal or requesting counsel to do so." *Id.* pp. 24-25.

The Commissioner candidly acknowledges "it would not be proper for the ALJ to discount Dr. Bansal's opinion because it was not provided under oath and was solicited by Plaintiff's attorney." Dkt. 11 p. 10. The Commissioner emphasizes, however, that "the primary reasons the ALJ discounted Dr. Bansal's opinion was because it was offered well after the relevant period, and was inconsistent with the evidence addressing Plaintiff's condition during the relevant period." *Id.* The Commissioner argues any error by the ALJ on this point has no bearing on the outcome and is harmless because substantial evidence supports the ALJ's overall rationale for giving Dr. Bansal's opinions little weight. *Id.*

The Commissioner's position is persuasive.   In the opinion of this Magistrate Judge, the ALJ's comments as to Dr. Bansal being chosen by Cross and not "being under oath," while improper, do not render the ALJ's overall assessment invalid.   The written decision establishes that the ALJ properly considered the entire record, including objective medical records and the medical opinions, in assessing residual functional capacity.   Cross has not sufficiently shown those comments warrant either reversal of the decision or remand for further proceedings.

Finally, Cross takes issue with the ALJ discounting Dr. Bansal's opinions because they were "dated nearly nine months after the claimant last met the insured status requirements for disability insurance benefits." A.R. 21.   He refers to his hospitalization for respiratory problems in March of 2011 (A.R. 337-42) and occipital STIM implant in September of 2011 (A.R. 448) as records which "establish severe limitations well before [his] date last insured." Dkt. 10 p. 26.   As described by Cross, "[a]ll in all, in 2011, [he] was hospitalized more than two weeks for respiratory issues and had two surgeries for his cervical spine issues" which "was on top of [his] prior 2009 surgery and other issues." Dkt. 12 p. 3.   Cross insists "Dr. Bansal's retrospective opinion should have been given great weight." Dkt. 10 p. 26.   In his view, "the ALJ should have fully and fairly developed the record rather than simply reject Dr. Bansal's opinion." *Id.*

In the Commissioner's view, however, ALJ Gatewood properly noted that the physical therapist evaluation and Dr. Bansal's report were nine months after Cross' insured status expired. Dkt. 11 p. 6.   The Commissioner contends evidence must be relevant to the claimant's condition during the time period for which benefits were denied and emphasizes Cross must establish his condition continued to be disabling such that it satisfies the Act's durational requirement of a continuous period of at least 12 months. *Id.* (citing 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a)). The Commissioner cites to "the largely normal objective examination findings made by" Cross' neurologist, Dr. Berg, in May 2011 (A.R. 342-48) as evidence his condition had improved

significantly and cannot satisfy the Act's durational requirement. *Id.* The Commissioner criticizes Cross' reliance on evidence before and after the relevant period while ignoring the substantial evidence supporting the ALJ's decision within the relevant period. *Id.* For example, the Commissioner notes Dr. Berg found Cross' posture was straight and his gait was stable, smooth and symmetric in May 2011 in contrast to PT Blankespoor and Dr. Bansal noting an unsteady gait by Cross in June 2012. *Id.* The Commissioner further points out:

> Dr. Berg also noted no abnormalities with Plaintiff's neck and that his extremities were properly aligned and grossly symmetric; his muscle mass, tone, and strength were normal and symmetric; he had no clubbing, cyanosis, or pedal edema; his joint exam was within normal limits with functional active range of motion in all joints; there was no evidence of pain with manipulation; he was alert and fully oriented; his cranial nerves were grossly intact; Romberg test was negative; he was able to rock up on heels and raise up on toes and take several steps forward without difficulty; he was able to tandem walk without loss of balance; and sensation was grossly intact (Tr. 346-347).

*Id.* p. 8. While recognizing Cross "experienced some pain and tenderness, slightly reduce range of motion in his cervical spine, and slightly diminished deep tendon reflexes," the Commissioner argues the "otherwise normal objective examination findings directly during the relevant period directly contradict the subsequent findings and assessments from Mr. Blankenspoor [sic] and Dr. Bansal nine months after the period at issue." *Id.*

The Commissioner also cites to the August 2012 opinion of the state agency consultant, Dr. Shumate, who reviewed the medical records and noted the findings during the relevant period from Dr. Berg "were significantly different" from the findings and assessments made by PT Blankespoor and Dr. Bansal. *Id.* (citing A.R. 151). Dr. Shumate further noted there was "no explanation for the inconsistencies" and found "[t]he preponderance of the evidence supports that [Cross] was capable of activity as noted in the RFC for the period from AOD until DLI 9/30/11." A.R. 151. The Commissioner contends ALJ Gatewood properly considered Dr. Shumate's assessment along with all the other record evidence, including from Dr. Berg, PT Blankespoor,

and Dr. Bansal. Dkt. 11 p. 9.

The arguments of the Commissioner are convincing.   Even Cross agrees that to be entitled to benefits he "is required to show the existence of a disability on or before September 30, 2011, the date that his insured status expired." Dkt. 10 p. 4, n. 2.   Thus, it was appropriate for ALJ Gatewood to consider the timing of not only the physical therapist evaluation and report of Dr. Bansal but all the other medical opinions and objective treatment records prior to, during, and after the period in which Cross would be entitled to benefits.   In the opinion of this Magistrate Judge, the ALJ did not error in discounting Dr. Bansal's opinions, or the physical therapist's evaluation, because they were provided nine months after the claimant last met the insured status requirements for disability insurance benefits.

### 2.   Existence of Substantial Medical Evidence

Under Cross' second brief point, he contends the ALJ's decision is not supported by substantial medical evidence. Dkt. 10 pp. 26-28.   Citing to *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), Cross argues the record must include evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. *Id.* pp. 26-27. He asserts Dr. Bansal provided such opinions as an examining physician but the "ALJ rejected those opinions." *Id.* p. 27.   Cross further asserts the opinions of non-examining state agency medical consultants, to which the ALJ gave some weight, do not constitute substantial evidence. *Id.* pp. 27-28.

In response, the Commissioner first emphasizes that, although it is the ALJ's responsibility to review the evidence and assess Cross' residual functional capacity, it is Cross' burden as the claimant to prove his residual functional capacity and he must provide objective medical evidence to do so. Dkt. 11 p. 11.   And contrary to Cross' assertion, the Commissioner contends the evidence supporting the ALJ's RFC determination may include objective medical evidence rather than opinions addressing specific functional abilities. *Id.*   The Commissioner argues Cross' reliance

on *Nevland* is misplaced because the decision "narrowly addressed the evidence necessary for an ALJ to satisfy the Commissioner's burden at step five of the sequential evaluation, and it does not preclude an ALJ's reliance on a nonexamining source's report at step four, where the burden is still on the claimant to establish an inability to perform past relevant work." *Id.* The Commissioner insists ALJ Gatewood was "entitled to rely on the assessments of the state agency medical consultants to satisfy the requirement that at least some medical evidence support her RFC determination." *Id.* pp. 11-12. According to the Commissioner, it is "clear that an ALJ plainly may rely on opinions from non-examining state agency medical consultants along with the other record evidence as the ALJ did here." *Id.* p. 12. As a result, the Commissioner suggests "there is no merit to Plaintiff's contention that the ALJ improperly relied on the opinion of Dr. Shumate along with all of the other record evidence in determining Plaintiff's RFC and was required to also obtain an opinion from a treating or examining source." *Id.* p. 13.

The Commissioner's argument is persuasive and appears in line with Eighth Circuit precedent and applicable regulations. Foremost, the Eighth Circuit has pointedly stated "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Instead of requiring "direct opinion evidence," it was reiterated that the assessment of RFC "'must be supported by some medical evidence of the claimant's ability to function in the workplace.'" *Id.* (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).

In addition, the Eighth Circuit has declined to extend the holding in *Nevland* as urged by Cross. In that decision, the Eighth Circuit found, in spite of numerous treatment notes, there was "no *medical* evidence about how Nevland's impairments affect his ability to function now." *Nevland,* 204 F.3d at 858. In determining Nevland's RFC, "[t]he ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians." *Id.*

The ALJ's decision denying benefits was reversed and the case remanded for the following reasons:

> In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity.

*Id.* (internal citation omitted).   The Eighth Circuit has limited the application of *Nevland*, however, in subsequent decisions:

> as we recognized in *Eichelberger v. Barnhart, Nevland* addressed the evidence necessary to satisfy an ALJ's burden of proof at step five in the disability analysis; *Nevland* does not preclude the ALJ's reliance on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work. 390 F.3d 584, 591 (8th Cir. 2004); *see also Masterson,* 363 F.3d at 737-39 (holding that the ALJ properly relied on the assessments of a nonexamining physician, and not claimant's treating physicians, in determining the RFC at step four). "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Harris,* 356 F.3d at 931.

*Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007).   As in those cases, the *Nevland* holding does not provide sufficient support for reversal of ALJ's Gatewood's decision here or remand for further proceedings to further develop the record.

When the record in this case is viewed as a whole, there is substantial evidence supporting the analysis and decision of ALJ Gatewood, including some medical evidence supporting the RFC determination.   As reflected in both the ALJ's written decision and the summary by this Magistrate Judge above, the record does contain evidence supporting Cross' claims of disability. But "'[t]he mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow this Court to reverse the decision of the ALJ." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (quoting *Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir.

2004)); *Johnson v. Colvin*, 788 F.3d 870, 873 (8th Cir. 2015) (same); *see also Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016) ("Even if substantial evidence in the record could have supported a contrary outcome, we must affirm the ALJ's decision if there is also substantial evidence to support it.").

### 3.   Assessment of Cross' Subjective Complaints

Cross asserts in his Complaint that ALJ Gatewood failed to give good reasons for discounting his testimony and improperly rejected his subjective complaints of disabling limitations. Dkt. 1 ¶¶ 14, 19.   He did not, however, expound upon those issues in his brief. Nevertheless, to provide a complete report and recommendation, those issues have been considered and are addressed as follows.

Factors for evaluating a claimant's subjective complaints were set forth by the Eighth Circuit in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (internal citations and quotations omitted); *see also Wright*, 789 F.3d at 853-54 (applying *Polaski* factors).   "The ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Jones*, 619 F.3d at 975; *see also Ford*, 518 F.3d at 982 ("The ALJ had to consider these matters, but did not have to discuss each one of them in relation to [the claimant].")   As further explained by the Eighth Circuit,

> [a]n ALJ may discredit any subjective allegations that cannot reasonably be expected to flow from an established, medically determinable impairment. 20 C.F.R. § 404.1529(b). Once a claimant has demonstrated the existence of an impairment that could reasonably be expected to produce the alleged symptoms, the question becomes whether the claimant's subjective allegations regarding the

extent of her symptoms are credible. *See id.* §§ 404.1528, 404.1545(e). The ALJ must consider the consistency of the evidence, and consider information provided by the claimant, her doctors, and others with knowledge of her circumstances. *Id.* § 404.1529(c); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

*Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016).

"'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *see also Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) ("Assessing and resolving credibility is a matter properly within the purview of the ALJ."). Thus, courts "'defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Mabry*, 815 F.3d at 389 (quoting *Johnson v. Colvin*, 788 F.3d at 872 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006))). The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford,* 518 F.3d at 982 (quoting *Lewis v. Barnhart,* 353 F.3d 642, 647 (8th Cir. 2003)); *Guilliams v. Barnhart,* 393 F.3d 798, 802 (8th Cir. 2005) (same).

Here, the credibility assessments of ALJ Gatewood appear to be supported by good reasons and substantial evidence. The ALJ explicitly noted the standards and factors to consider with the objective medical evidence when assessing a claimant's credibility. A.R. 17-18. After detailing certain aspects of the medical records for treatment of Cross' various health conditions, the ALJ determined Cross "experiences some symptoms and limitations, but the record does not fully support the severity of [his] allegations." *Id.* 18-19. In doing so, the ALJ found "numerous inconsistencies that erode" the credibility of Cross' allegations. *Id.* 19-20.

In this Magistrate Judge's opinion, the ALJ's assessment of Cross' subjective complaints was in accordance with the requisite standards. As repeatedly instructed by the Eighth Circuit, "'[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a

whole.'" *Igo*, 839 F.3d at 731 (quoting *Pearsall*, 274 F.3d at 1218 (citing *Polaski,* 739 F.2d at 1322)); *see also Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) ("The ALJ may properly discount the claimant's testimony where it is inconsistent with the record."); *Ford*, 518 F.3d at 982 (ALJ permitted to discount claimant's complaints if inconsistent with the evidence as a whole). Consequently, the Court should defer to ALJ Gatewood's credibility determinations in this case.

### 4.   Adequacy of Hypothetical Question to Vocational Expert

In his Complaint, Cross asserts the ALJ posed a hypothetical question to the vocational expert that does not adequately describe his limitations. Dkt. 1 ¶ 20.   He did not, however, expound upon the issue in his brief.   Again, to provide a complete report and recommendation, the issue has been considered and addressed as follows.

"The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams*, 393 F.3d at 804; *see also Boyd*, 831 F.3d at 1021.   "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Id.* (quoting *Davis v. Apfel,* 239 F.3d 962, 966 (8th Cir. 2001)).   As further explained,

> [t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments.

*Renstrom*, 680 F.3d at 1067 (quoting *Jones*, 619 F.3d at 972 (internal quotation marks and citation omitted)).   Thus, "[t]estimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Cox*, 495 F.3d at 620.

But an "'ALJ's hypothetical question to the vocational expert needs to include only those

impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise*, 641 F.3d at 927 (quoted citation omitted).   Stated otherwise, "the hypothetical question to the vocational expert [does] not need to incorporate the additional limitations the ALJ had properly disregarded." *Renstrom*, 680 F.3d at 1067; *see also Wildman,* 596 F.3d at 969 ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("The hypothetical question need only include those impairments and limitations found credible by the ALJ."); *Guilliams*, 393 F.3d at 804 ("Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."); *Haynes v. Shalala,* 26 F.3d 812, 815 (8th Cir. 1994) ("A hypothetical question need only include those impairments that the ALJ accepts as true.").

In this Magistrate Judge's opinion, the hypothetical question posed to the vocational expert by ALJ Gatewood was within these requisite standards.   The written decision reflects the hypothetical included limitations the ALJ found were credible and substantially supported by the record as a whole, but excluded those limitations disregarded as not credible.   Cross has not shown a sufficient reason for either reversal or remand due to the hypothetical question posed in this case.

## V. RECOMMENDATION

After a thorough examination of the Administrative Record, and in accordance with the standards of review the Court must follow, this Magistrate Judge concludes that the ALJ's determination that Tracy A. Cross is not disabled under the Social Security Act complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Accordingly, it is recommended that the final decision denying disability insurance benefits to Mr. Cross be affirmed and judgment be entered in favor of defendant Commissioner of the Social Security Administration.

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72A, the parties shall

have until **August 11, 2017**, to file specific, written objections to this report and recommendation.


    Dated July 28, 2017.

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE